**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT, CENTER FOR CONSTITUTIONAL RIGHTS, and AMICA CENTER FOR IMMIGRANT RIGHTS,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Defendant.*

Civil Action No.: 25-cv-5292 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

INTRODUCTION ..........1

FACTUAL BACKGROUND ..........1

PROCEDURAL BACKGROUND ..........7

STANDARDS OF REVIEW ..........8

I. Summary Judgment Standard ..........9

II. 5 U.S.C. § 552(b)(5) Exemptions Standards ..........10

A. Deliberative Process Privilege ..........10
B. Attorney Work Product Privilege ..........11
C. Attorney Client Privilege ..........11

III. Adequacy of Search Standard ..........12

ARGUMENT ..........13

I. Key Memoranda Must Be Produced ..........13

II. Email Communications and Attachment Should Be Produced ..........16

A. Email Attachment ..........16
B. Email Communications ..........16

III. Entirely Withheld Spreadsheets Should Be Produced ..........18

IV. Court should review the exempted material in camera ..........19

CONCLUSION ..........20

## Table of Authorities

CASE ........................................................................................................ PAGE NO.

*A.G.P.C. v. Olson*, No. 25 C 10729, 2026 WL 1398726 (N.D. Ill. May 12, 2026) ........................................ 2

*ACLU Immigrants' Rts. Project v. U.S. Immigration and Customs Enf't,* 58 F.4th 643 (2d. Cir. 2023) ........................................ 9

*Am. C.L. Union v. Dep't of Def.*, No. 15 CIV 9317 (AKH), 2017 WL 4326524 (S.D.N.Y. Sept. 27, 2017) ........................................ 14

*Am. C.L. Union v. F.B.I.,* No. 11CV7562, 2015 WL 1566775 (S.D.N.Y. Mar. 31, 2015) ........................................ 15

*Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*, 376 F. Supp. 3d 345 (S.D.N.Y. 2019) ........................................ 20

*Austin Sanctuary Network v. Dep't of Homeland Sec.*, No. 20-cv-1686, 2022 WL 4356732 (S.D. N.Y. Sept. 19, 2022) ........................................ 11, 12

*Bagwell v. U.S. Dep't of Just.*, No. 15-CV-00531, 2015 WL 9272836 (D.D.C. Dec. 18, 2015) ........................................ 15

*Carney v. U.S. Dep't of Justice*, 19 F.3d 807 (2d Cir. 1994) ........................................ 9

*Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F.Supp.3d 336 (D.D.C. 2018) ........................................ 18

*Cmty. Legal Servs. E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F.Supp. 3d 897 (N.D. Cal. 2025) ........................................ 5

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ........................................ 10, 17

*Dzwonczyk v. State Univ. of New York at Buffalo*, No. 07-CV-00598(M), 2008 WL 11363386 (W.D.N.Y. July 7, 2008) ........................................ 18

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) ........................................ 8

*Hickman v. Taylor*, 329 U.S. 495 (1947) ........................................ 11

*Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81 (2d Cir. 1991) ........................................ 19

*In re County of Erie*, 473 F.3d 413 (2d Cir. 2007) ........................................ 12

*In re Horowitz*, 482 F.2d 72 (2d Cir. 1973)....................17

*Kettlewell v. Noem*, No. CV-25-00491-TUC-RM, 2025 WL 2733309 (D. Ariz. Sept. 25, 2025)....................2

*King v. Dep't of Just.*, 830 F.2d 210 (D.C. Cir. 1987)....................16

*Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810 (S.D.N.Y. 2021)....................10

*L.G.M.L. v. Noem*, 800 F. Supp. 3d 100 (D.D.C. 2025)....................2

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977)....................15, 17

*N.Y. Times Co. v. CIA*, 314 F.Supp.3d 519 (S.D.N.Y. 2018)....................9

*N.Y. Times Co. v. DOJ*, 872 F.Supp.2d 309 (S.D.N.Y. 2012)....................1

*NAACP Legal Def. & Educ. Fund, Inc. v. Dep't of Just.*, 463 F. Supp. 3d 474 (S.D.N.Y. 2020)....................15

*Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350 (2d Cir. 2005)....................10, 12

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't. Agency*, 486 F.Supp.3d 669 (S.D.N.Y. 2020)....................10

*Nat'l Day Laborer Org. Network v. U.S. Immigr. Customs Enf't Agency*, 877 F.Supp.2d 87 (S.D.N.Y. 2012)....................9, 12

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 811 F. Supp. 2d 713 (S.D.N.Y. 2011), *amended on reconsideration* (Aug. 8, 2011)....................11, 12

*Nat'l Imm. Project of Nat'l Laws. Guild v. U.S. Dep't of Homeland Sec.*, 868 F.Supp.2d 284 (S.D.N.Y. 2012)....................10, 14

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)....................9

*Playboy Enters., Inc. v. Dep't of Just.*, 677 F.2d 931 (D.C. Cir. 1982)....................19

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007)....................14, 15

*United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1999)....................11

*United States v. Mejia*, 655 F.3d 126 (2d Cir.), *cert. denied*,
565 U.S. 992 (2011) ........ 11, 17

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) ........ 8, 9

*Wilner v. NSA*, 592 F.3d 60 (2d Cir. 2009) ........ 9

*Wood v. FBI*, 432 F.3d 78 (2d Cir. 2005) ........ 9

**RULES, REGULATIONS AND STATUTES ........ PAGE NO.**

5 U.S.C. § 552 ........ *passim*

8 U.S.C. § 1232(c)(5) ........ 1

Trafficking Victims Protection Act ........ 5, 6

Fed. R.Civ. P. 56 ........ 1, 9

90 Fed. Reg. 13,554 (Mar. 25, 2025) ........ 3

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Florence Immigrant and Refugee Rights Project, Center for Constitutional Rights, and Amica Center for Immigrant Rights (collectively, "Plaintiffs") move this Court for an order denying the Motion for Summary Judgment, Dkt. 17, submitted by the United States Department of Health and Human Services ("HHS" or "Defendant") and granting Plaintiffs' Cross-Motion for Summary Judgment (hereinafter the "Cross-Motion").[1] For the reasons set forth below, HHS's cited bases for withholding and redacting documents under § 552(b)(5) – deliberative process privilege, attorney work product, and attorney-client privilege – are unjustified. Plaintiffs therefore respectfully request that the Court: (1) compel disclosure of certain redacted and withheld portions of the records requested, or, in the alternative, conduct an *in camera* review of these records and order relief as the Court deems appropriate, and (2) find that Defendant's searches were inadequate to the extent they failed to yield final versions of agency memoranda.

## FACTUAL BACKGROUND

During the last year, Defendant HHS has reshaped the provision of legal services to unaccompanied immigrant children (hereinafter "UCs") with the precision of a bulldozer and the transparency of a brick wall. Under federal law, HHS is required to provide UCs with access to counsel to the greatest extent possible. *See* 8 U.S.C. § 1232(c)(5). For nearly two decades, that statutory obligation has taken the form of an HHS-funded network of legal service organizations around the country that provide UCs with legal orientation, screening, and representation. These service providers also keep a watchful eye on conditions inside HHS-funded shelters and have

[1] Because the Court has deemed Local Rule 56.1 statements of undisputed facts to be unnecessary in FOIA matters, *see, e.g.*, *N.Y. Times Co. v. DOJ*, 872 F.Supp.2d 309, 314 (S.D. N.Y. 2012), Plaintiffs have not submitted one.

repeatedly raised alarms when abuses occurred, including during the 2018 family separation crisis. They are both essential legal advocates and the eyes and ears on the ground for an extremely vulnerable population. This structure of legal services has been under attack for the last year and a half because its elimination would allow the Trump Administration to more expeditiously remove UCs from the U.S., a long-sought goal.[2]

Over Labor Day weekend in 2025, HHS, through its sub-agency the Office of Refugee Resettlement (ORR), launched a late-night operation to try to unlawfully repatriate Guatemalan UCs. The children's legal service providers received notice of the plan and sounded the alarm, and the repatriation plan was swiftly enjoined by every court that heard challenges to those actions. *See Kettlewell v. Noem*, No. CV-25-00491-TUC-RM, 2025 WL 2733309, at *1 (D. Ariz. Sept. 25, 2025); *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 109, 134 (D.D.C. 2025); *A.G.P.C. v. Olson*, No. 25 C 10729, 2026 WL 1398726, at *2 (N.D. Ill. May 12, 2026).

ORR claimed that its plan was merely an attempt to "reunify children with parents who had requested their return." *L.G.M.L.*, 800 F. Supp. 3d at 110. However, under the faintest scrutiny, that explanation "crumbled like a house of cards." *Id.* In fact, ORR could point to no evidence that the parents of these children sought their return. *Id.* "To the contrary, the Guatemalan Attorney General reports that officials could not even track down parents for most of the children whom Defendants found eligible for their 'reunification' plan. And none of those that were located had asked for their children to come back to Guatemala." *Id.*

Barred by courts from executing their plans to put children on planes under the guise of "repatriation," ORR then launched a program to offer cash to children in exchange for their

---

[2] Ruth Marcus, *How Trump Is Trying to Weaken Migrant Children's Legal Defense*, New Yorker (Aug. 15, 2026), https://www.newyorker.com/news/the-lede/how-trump-is-trying-to-weaken-migrant-childrens-legal-defense.

speedy exit from the country.[3] In October 2025, the government reportedly initiated a program offering UCs a $2,500 "one-time resettlement support stipend" if they agreed to voluntarily depart the United States. The offer applied to UCs aged 14 and older and would be paid only after an immigration judge approved the child's departure and the child returned to the country of origin. Reporting also indicated that children were given only 24 hours to respond, raising serious concerns that the government was using financial pressure to induce vulnerable children to waive statutory protections, abandon legal claims, and accept return without meaningful consultation with counsel.[4]

Recent agency action and reporting show that ORR's child-welfare function has become entangled with ICE enforcement against noncitizen sponsors, delaying children's release from custody. In March 2025, ORR removed its Foundational Rule's prohibition on sharing sponsor immigration-status information with law-enforcement and immigration-enforcement entities.[5] The Associated Press (AP) later reported that ORR required parents seeking reunification to appear in person for identity-verification interviews where federal law-enforcement agencies may be present, and that legal groups reported parent arrests while children remained in custody.[6] The Guardian similarly reported that ICE "welfare checks" were being used to locate

---

[3] Christian Martinez, *Trump Administration Offers Unaccompanied Migrant Children $2,500 to Voluntarily Leave US, Letter Shows*, Reuters (Oct. 3, 2025), https://www.reuters.com/legal/government/trump-administration-offers-unaccompanied-migrant-children-2500-voluntarily-2025-10-04; Valerie Gonzalez, *Trump Administration Offers Migrant Children $2,500 to Voluntarily Return to Home Countries*, Associated Press (Oct. 3, 2025), https://apnews.com/article/ice-immigration-orr-shelters-b855b5a03a6be3ba62662a5999a5984f; José Olivares & Maanvi Singh, *Trump Administration to Offer Unaccompanied Minors $2,500 to Self-Deport, Memo Reveals*, Guardian (Oct. 3, 2025), https://www.theguardian.com/us-news/2025/oct/03/unaccompanied-minors-self-deport-payment.

[4] *See* Gonzalez, *supra* n.3.

[5] *Unaccompanied Children Program Foundational Rule; Update To Accord With Statutory Requirements*, 90 Fed. Reg. 13,554, 13,554–55 (Mar. 25, 2025), *available at* https://www.federalregister.gov/documents/2025/03/25/2025-04971/unaccompanied-children-program-foundational-rule-update-to-accord-with-statutory-requirements; Ted Hesson, *Trump Administration Rolls Back Restrictions on Sharing Migrant Minor Sponsors' Immigration Status*, Reuters (Mar. 24, 2025), https://www.reuters.com/world/us/trump-administration-rolls-back-restrictions-sharing-migrant-minor-sponsors-2025-03-24/.

[6] Valerie Gonzalez, *ICE Is Showing Up to Interview Parents Hoping To Reunite with Their Children Who Entered*

UCs and sponsors for enforcement purposes while ORR resumed sharing sensitive sponsor information with ICE.[7]

These policies have also prolonged children's confinement. The AP reported that children released from ORR custody averaged 171 days in custody in July 2025, down from 217 days in April but far above 37 days in January 2025 before these changes were implemented.[8] Advocates attributed the increase to the new sponsor-vetting and enforcement policies.[9] As children languish in detention for longer periods of time, they have increased risk of sexual abuse as well as mental health, physical, and developmental harm.[10] Tragically, one three-year-old was sexually abused as she endured a period of prolonged detention in an ORR shelter while waiting to reunify with her father.[11] Because of these serious risks, in-person and independent counsel is absolutely essential to provide some level of oversight.

Recent reporting confirms that the government has also sought to accelerate removal proceedings for UCs in custody, creating precisely the kind of rushed process that makes meaningful access to competent counsel indispensable. In April 2026, CNN reported that the administration was moving to fast-track deportations of migrant children in federal custody by pushing immigration hearings forward by weeks or months, with children as young as four appearing repeatedly in immigration court, at times without counsel.[12]

---

*US Alone*, Associated Press (Sept. 2, 2025), https://apnews.com/article/81b20a1e3651337cec14b508f59cc52f.

[7] Jose Olivares, *ICE Seeking Out Unaccompanied Immigrant Children To Deport or Prosecute*, Guardian (Apr. 28, 2025), https://www.theguardian.com/us-news/2025/apr/28/ice-unaccompanied-immigrant-children.

[8] Gonzalez, *supra* n.6.

[9] *Id.*

[10] Academic Pediatric Ass'n et al., *Comment on Notice of Proposed Rulemaking, RIN 0970-AD26, Unaccompanied Children Program Foundational Rule; Sponsor Assessment Update to Include Proof of Identity, Background Check, Placement, and Income Verification Standards* 3-5 (Aug. 25, 2026), https://www.psychiatry.org/getattachment/ce4f9672-92bb-4511-a373-5871e14007f6/APA-Letter-Proposed-Rule-Unaccompanied-Children-08252026.pdf.

[11] Valerie Gonzalez, *3-Year-Old Immigrant Suffered Alleged Sexual Abuse During Months in Federal Custody, Family Says*, Associated Press (Apr. 6, 2026), https://apnews.com/article/b799ace25087c594339298685438e888.

[12] Alissa Reznik, *1-year-old faced immigration court in Arizona without a lawyer. Advocates say it's part of trend*, KJZZ (Sept. 2, 2026), https://www.kjzz.org/kjzz-news/2026-09-02/1-year-old-faced-immigration-court-in-arizona-

Finally, and most importantly for this case, HHS has also been moving away from the existing federally funded system (Unaccompanied Children Program, or "UCP") that provides in-person legal services to unaccompanied immigrant children.[13] HHS issued a stop work order for the UCP in February 2025 and then attempted to terminate the UCP in its entirety in March 2025, after which 11 legal service providers, including the Florence Immigrant and Refugee Rights Project ("Florence Project") and Amica Center for Immigrant Rights ("Amica"), Plaintiffs in this case, successfully argued for a preliminary injunction enjoining the government from withdrawing the services or funds provided for UCs under the Trafficking Victims Protection Act ("TVPRA") and ORR's Foundational Rule. *Cmty. Legal Servs. E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F.Supp. 3d 897, 908 (N.D. Cal. 2025), *appeal filed* 25-2808 (May 1, 2025 9th Cir.) (hereinafter "*CLSEPA*"). Until July 31, 2026, the Florence Project and Amica, along with other organizations across the country, subcontracted with the Acacia Center for Justice ("Acacia"), the prime contract holder for the UCP contract, to provide federally mandated legal services to UCs. *See id*. at 915.

Despite prevailing on the motion for preliminary injunction, plaintiffs in *CLSEPA* have continued to fight to protect funding for services for children. On July 1, 2026, the *CLSEPA* plaintiffs filed a motion for an order to show cause as to why defendants should not be held in civil contempt because ORR stopped paying invoices to Acacia for the network since December 2025. *See* Pls.' Notice of Mot. & Mot. for an Order to Show Cause, *CLSEPA*, No. 4:25-cv-02847-AMO (N.D. Cal. July 1, 2026), ECF No. 157. According to this filing, ORR is withholding payment until it receives information from providers that was not previously

without-a-lawyer-advocates-say-its-part-of-trend; Priscilla Alvarez, *Exclusive: Trump Moves to Accelerate Deportations of Migrant Children in US Custody*, CNN (Apr. 28, 2026), https://www.cnn.com/2026/04/28/politics/migrant-children-deportations-trump.

[13] Paul Flahave, *Trump Administration in talks with Texas over lawyers for migrant children,* Austin-American Statesman (July 3, 2026), https://www.statesman.com/news/article/trump-migrant-children-legal-aid-texas-22331975.php.

required and that would be logistically impossible to compile. *Id.* at 6. The motion for order to show cause was granted on July 2, 2026, leading to a hearing and a subsequent motion to enforce the preliminary injunction, again based on the ongoing non-payment for services to UCs since December 2025. *See* Pls.' Notice of Emergency Mot. & Mot. To Enforce the Prelim. Inj., *CLSEPA*, No. 4:25-cv-02847-AMO (N.D. Cal. July 23, 2026), ECF No. 166.

The *CLSEPA* motion to enforce was ultimately granted, *CLSEPA*, No. 25-cv-02847-AMO, 2026 WL 2271738 (Aug. 6, 2026 N.D. Cal.), but the long-delayed payment impeded legal service providers' abilities to provide legal representation services, as they were forced to find other resources to support their work, consider furloughs or other staffing changes, or terminate their contract with Acacia. *See* Pls.' Notice of Emergency Mot. & Mot. To Enforce the Prelim. Inj., *CLSEPA*, No. 4:25-cv-02847-AMO (N.D. Cal. July 23, 2026), ECF No. 166 at 1.

On Friday, July 31, 2026, ORR declined to extend a contract that provided legal services to UCs. *CLSEPA*, 2026 WL 2271738, at *2. As a result, more than 20,000 children around the country are without federally funded legal representation.[14] The future of legal services mandated under the TVPRA and the Foundational Rule for UCs is extremely unclear following ORR's decision to allow this contract to lapse, and enormous confusion and chaos has resulted, including children obtaining final deportation orders in immigration court without

[14] Sonja Sharp, *More than 24,000 Migrant Children Could Lose Legal Representation as Federal Contract Expires*, L.A. Times (July 29, 2026), https://www.latimes.com/california/story/2026-07-29/24-000-migrant-children-could-lose-legal-representation-as-contract-is-set-to-expire (reporting that the loss of federal funding for legal representation could result in thousands of children facing removal proceedings without counsel); Roque Planas, *Trump Administration to Let Contract Aiding Unaccompanied Minors Expire*, The Guardian (July 30, 2026), https://www.theguardian.com/us-news/2026/jul/30/trump-administration-children-immigration (noting that the federal government allegedly owes approximately $65 million to legal service providers, that nonprofit organizations have already laid off attorneys after months without payment, and that providers declined a proposed temporary contract because they asserted that it would have required disclosure of confidential client information).

legal counsel.[15] Though there are many competent and experienced legal service providers across the country, the lack of payment and uncertainty that the Government is creating in the funding and provision of services puts providers in the position of being forced to limit services to children due to lack of resources and staffing, delayed payment, and uncertainty in the future of the contract.[16] Through these tactics, the government is artificially creating legal deserts across the country, and the result is that children who need and are entitled to attorneys cannot get one.

Many of the documents at issue in this matter detail changes to the legal services contract. In the instant litigation, Defendant HHS's declarant, Brandon Lancey, admits that the withheld materials include "internal email communications, draft documents, legal analyses, attorney communications, and other internal records concerning the VERA/Acacia contract for legal services to UCs, the stop-work order, subsequent contracting and programmatic issues, and related legal and policy questions." Dkt. 19 ("Lancey Decl.") ¶ 10. These materials are all highly relevant to the chaos this Administration has sown in the UC legal services sector and of significant public interest given their impact on a highly vulnerable population.

## PROCEDURAL BACKGROUND

On March 11, 2025, Plaintiffs submitted a FOIA request to HHS seeking records related to the February 2025 "stop work order." Dkt. 1-1. HHS did not respond appropriately to the FOIA request within the statutory time limit. Plaintiffs then filed a Complaint in this Court on

---

[15] Marcus, *supra* n.2 (describing the disruption of established attorney-client relationships after ORR allowed its nationwide legal-services contract to expire); Valerie Gonzalez & Ryan J. Foley, *Law Firm with Ties to Trump Administration Declines Offer to Represent Migrant Children*, Associated Press (Aug. 12, 2026), https://apnews.com/article/texas-migrant-children-deport-immigrationd070db48239d70082d22a52197e58e10 (reporting that interim attorneys appeared unannounced in immigration court claiming to represent children they had never met, causing confusion among judges and existing counsel).

[16] *See* Flahave, *supra* n.13; Sharpe, *supra* n.14.

June 25, 2025 to compel HHS to adequately search for and produce records responsive to Plaintiffs' request. Dkt. 1.

Between November 2025 and June 2026, Defendant HHS produced 2,131 pages of responsive records, many of them containing substantive redactions. Plaintiffs and Defendant engaged in good-faith negotiations related to a number of these redactions, but even after Plaintiffs narrowed the number of documents of interest, HHS refused to segregate and unredact any additional material.

Plaintiffs have previously requested final versions, or final draft versions, of several of the records in dispute, rather than litigate exemptions in earlier drafts of the same documents, specifically the "decision memos" contained in Bates Nos. 218-221, 229-231, 233-238, 240-272, 286-293. *See* Decl. of C.J. Sandley ("Sandley Decl."), Ex. A2-A8. As noted by Defendant in its motion, Plaintiffs originally agreed not to make an adequacy of search challenge in this litigation. *See* Dkt. 18 at 3 n.2. However, because HHS did not provide final versions of these memos, or any response to Plaintiffs' inquiries as to whether the versions produced to Plaintiffs were the most recent and/or final versions, Plaintiffs are left to now challenge the adequacy of HHS's searches in relation only to these specific documents.[17]

## STANDARDS OF REVIEW

FOIA's central purpose is to "promote honest and open government" *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999), by "pierc[ing] the veil of administrative secrecy and open[ing] agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (citation omitted). "FOIA requires 'virtually every document,' *i.e.*, record, 'generated by an agency [to be made] available to the public in one form or another,'

[17] Plaintiffs counsel informed Defendant's counsel as soon as they were aware of the need to make this challenge, via email on September 10, 2026.

unless an agency clearly demonstrates that it 'falls within one of the Act's nine exemptions.'" *ACLU Immigrants' Rts. Project v. U.S. Immigration and Customs Enf't*, 58 F.4th 643, 652 (2d. Cir. 2023) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975)); *see also Ray*, 502 U.S. at 173; 5 U.S.C. § 552(a)(4)(B). Here, certain of HHS's withholdings and redactions under 5 U.S.C. § 552(b)(5) are improper, and HHS's searches were inadequate to the extent they failed to yield final versions of memoranda of which drafts have been withheld under § 552(b)(5).

## I. Summary Judgment Standard

Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R.Civ. P. 56(a). To satisfy their summary judgment burden, agencies must submit affidavits that are "detailed, nonconclusory and submitted in good faith." *Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005) (citations omitted). The agency bears the burden of demonstrating that it conducted an adequate search for records responsive to the FOIA request and that any withheld material is properly exempt from disclosure. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). The agency must "show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Nat'l Day Laborer Org. Network v. U.S. Immigr. Customs Enf't Agency*, 877 F.Supp.2d 87, 95 (S.D. N.Y. 2012) (quotations and citations omitted). To justify decisions to withhold responsive records, an agency must provide "reasonably detailed explanations why any withheld documents fall within an exemption[.]" *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009) (quotations and citations omitted); *see also N.Y. Times Co. v. CIA*, 314 F. Supp. 3d 519, 525 (S.D. N.Y. 2018) ("conclusory assertions are insufficient" in affidavits seeking to justify exemptions).

**II. 5 U.S.C. § 552(b)(5) Exemptions Standards**

A. Deliberative Process Privilege

Defendant improperly redacted and withheld information based on 5 U.S.C. § 552(b)(5)'s exemption of materials subject to deliberative process privilege. The deliberative process privilege does not shield "opinions and interpretations which embody the agency's effective law and policy" and permits only the withholding of documents or communications that "reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't.*, 486 F.Supp.3d 669, 690 (S.D. N.Y. 2020) (quoting *Sears*, 421 U.S. at 153). Pursuant to the deliberative process privilege, "[a]n inter- or intra-agency document may be withheld . . . if it is: (1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually . . . related to the process by which policies are formulated." *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005) (quotations and citations omitted); *see Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810, 831 (S.D.N.Y. 2021) (privilege does not protect post-decisional communications "transmitted to subordinates for application").

Critically here, "determinations of how ICE applies" its policies in "specific cases" do not fall "within the protection of the deliberative-process privilege." *Nat'l Immigr. Project of Nat'l Laws. Guild v. U.S. Dep't of Homeland Sec.*, 868 F. Supp. 2d 284, 293 (S.D. N.Y. 2012). In such records, "[n]o 'decision' is being made or 'policy' being considered; rather the documents discuss established policies . . . in the light of a specific . . . fact pattern." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980). In other words, "opinions about the applicability of existing policy to a certain state of facts provide important

insights into how those tasked with interpreting a policy . . . understand its often ambiguous terms," but "courts have nonetheless compelled their disclosure." *Nat'l Immigr. Project of Nat'l Laws. Guild*, 868 F. Supp. 2d at 294 (cleaned up); *Austin Sanctuary Network v. Dep't of Homeland Sec.*, No. 20-cv-1686, 2022 WL 4356732, at *15 (S.D.N.Y. Sept. 19, 2022).

B. <u>Attorney Work Product Privilege</u>

This Court has explained:

> The attorney work product doctrine applies to memoranda prepared by an attorney *in contemplation of litigation* which sets forth the attorney's theory of the case and [her] litigation strategy. The doctrine protects the files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways' prepared in anticipation of litigation. The doctrine is limited in scope and does not protect every written document generated by an attorney. [A]n attorney's mental impressions do not become protected work product simply because they were expressed *concurrently with* some form of litigation. Additionally, [d]ocuments that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation are not protected as attorney work product.

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 736-37 (S.D.N.Y. 2011), *amended on reconsideration* (Aug. 8, 2011) (quotations and citations omitted). The purpose of the work product privilege is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1999) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).

C. <u>Attorney-Client Privilege</u>

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir.), *cert. denied*, 565 U.S. 992 (2011). "[T]he attorney-client privilege protects most confidential

communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance." *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007); "Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 755 (S.D.N.Y. 2011), *amended on reconsideration* (Aug. 8, 2011), quoting *Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350, 360 (2d Cir. 2005).

**III. Adequacy of Search Standard**

Moreover, Defendant's searches are inadequate to the extent they failed to yield the final versions of memoranda of which drafts have been withheld. *See* Sandley Decl., Ex. A2-A8. Agencies should not approach a FOIA request "as a private litigant might approach a document request," but instead "in a capacious manner befitting an agency of the United States government charged with the statutory responsibility to produce for public consumption the greatest number of records that fall within the FOIA request[.]" *Austin Sanctuary Network*, 2022 WL 4356732, at *8. Courts should not grant summary judgment in favor of the agency "where the agency's response raises serious doubts as to the completeness of the agency's search, where the agency's response is patently incomplete, or where the agency's response is for some other reason unsatisfactory." *Nat'l Day Laborer Org. Network*, 877 F.Supp.2d at 96 (internal citation omitted). Under this standard, Defendant's searches are plainly inadequate to the extent they failed to yield the final versions of memoranda of which drafts have been withheld.[18]

[18] Plaintiffs acknowledge that Defendant has not yet had the chance to submit detailed declarations related to its searches. However, Plaintiffs maintain that Defendant should have previously produced final and/or final draft versions of the decision memos at issue, and that final versions would likely, at a minimum, have segregable information, as with the one final decision memo that was produced, Bates Nos. 90-94. *See* Sandley Decl., Ex. A1.

## ARGUMENT

HHS has improperly withheld or failed to produce, in whole or in part, three categories of documents: (1) final memoranda; (2) emails and attachments; (3) spreadsheets. As set forth below, HHS's cited bases for withholding these documents under § 552(b)(5) – deliberative process privilege, attorney work product, and attorney-client privilege – are not wholly justified.

### I. Key Memoranda Must Be Produced

HHS has not produced the final versions of the memoranda from March 2025 withheld at Bates Nos. 218-221, 229-231, 233-238, 240-242, 244-265, 266-272, 286-293. Sandley Decl., Ex's A2-A8. The only final memorandum HHS produced is dated July 14, 2025, Bates Nos. 90-94, which is partially redacted as deliberative process privilege. Sandley Decl., Ex. A1.

First, with regard to the July 14, 2025 memorandum: this document is titled "DECISION . . ." and appears to be a final memorandum requesting authorization to award a "bridge contract to the incumbent contractor" for ORR's legal services to UCS. *Id.* The redacted information includes dollar amounts, Bates Nos. 90-91, 94 and "the rationale for a proposed decision," Bates No. 92. Dkt. 19-1 at 7. This document, however, represents a *final* decision by ORR to request approval for the bridge contract, *and* a *final* decision by the Administration of Children and Families ("ACF", part of Defendant HHS) to approve the request; it is not predecisional. Bates No. 94 (including signed approval by Andrew Gradison, Acting Assistant Secretary of ACF). If ACF administrators had questions, feedback, or edits in response to this proposal, that content might be predecisional, but no such content is included in this memo – it includes a proposal that was approved. Moreover, that proposal was operationalized. The bridge contract was, in fact, awarded to Acacia, just as requested and

approved in the memo, undermining any assertion that the agency would be harmed by revealing the content of the contract, which is now public.[19]

Regarding the remaining memoranda (Bates Nos. 218-221, 229-231, 233-238, 240-242, 244-265, 266-272, 286-293), all of which are from March 2025 and have been withheld in full, HHS must produce the final versions. If any of the withheld versions are final versions, or simply the *last* version, then they should be produced because they are not subject to deliberative process privilege or attorney-client privilege. *Nat'l Imm. Project of Nat'l Lawyers Guild*, 868 F.Supp.2d 284, 293-94 (S.D.N.Y. 2012) ("FOIA requires disclosure of statements of policy and interpretations which have been adopted by the agency and instructions to staff that affect a member of the public, because the public has an undeniable interest in knowing what the law is.") (quotations and citations omitted); *Am. C.L. Union v. Dep't of Def.*, No. 15 CIV 9317 (AKH), 2017 WL 4326524, at *7 (S.D.N.Y. Sept. 27, 2017) (ordering disclosure of a draft CIA document and holding, "In situations such as this, where no final version of a draft document exists, shielding the draft from disclosure does not serve the purpose of the deliberative process privilege because the public cannot scrutinize the draft against its final version.").

Moreover, HHS takes the position that in the 53 pages of memoranda, fully withheld under (b)(5), not a word is segregable. *See* Lancey Decl. ¶¶ 31-32. This claim is unpersuasive. First, it is for the Court to make specific findings of segregability before approving the application of any given FOIA exemption. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007). And, even if the Court were to determine that Exemption 5 applies to the memoranda, Exemption 5 does not permit HHS to withhold portions of the document that contain segregable information. Under FOIA, "[a]ny reasonably segregable portion of a record

---

[19] SAM.gov, Unaccompanied Alien Children (UAC) Legal Services (last accessed Sept. 11, 2026), https://sam.gov/opp/d23db19fe1c9460eb810759fb2ab7e6e/view; Definitive Contract 75P00125C00016, Higher Gov (last accessed Sept. 11, 2026), https://www.highergov.com/contract/75P00125C00016/

shall be provided . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). As this Court has explained, "nonexempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Am. C.L. Union v. F.B.I.*, No. 11CV7562, 2015 WL 1566775, at *2 (S.D.N.Y. Mar. 31, 2015) (quotations and citations omitted). In order for the Court to make informed, specific findings of segregability, however, agencies must provide a detailed justification for non-segregability and a description of what proportion of the information is non-exempt and how that material is dispersed throughout the document. *Sussman*, 494 F.3d at 1116; *Mead Data Central Inc. v. Dep't of the Air Force*, 566 F. 2d 242, 261 (D.C. Cir. 1977). HHS has done no such thing here. *See* Lancey Decl. ¶¶ 31-32; Dkt. 19-1.

Finally, and in the alternative, if HHS's searches yielded drafts of documents but not the final versions, then the searches were inadequate and should be supplemented in order to locate the final memos. HHS's failure to produce material known to be in its possession "raises a legitimate question as to thoroughness of the search." *See Bagwell v. U.S. Dep't of Justice*, No. 15-cv-00531, 2015 WL 9272836, at *2 (D.D.C. Dec. 18, 2015) (finding doubt as to the adequacy of a search where it failed to uncover a record of communication alluded to in public). The "existence" and "possible existence" of "potentially responsive documents" that have not been searched for in accordance with Plaintiffs' Request demonstrate the "facially under-inclusive and unduly restrictive" nature of HHS's search. *NAACP Legal Def. & Educ. Fund*, 463 F.Supp.3d 474, 478, 486 (S.D.N.Y. 2020).

## II. Email Communications and Attachment Should Be Produced

HHS has also partially withheld a number of email communications and fully withheld an attachment to an email, citing § 552(b)(5). These withholdings are overly broad.

### A. Email Attachment (Ex. D, Bates No. 55)

As to the fully withheld email attachment at Bates No. 55, HHS does not even indicate what *kind* of document this is. Based on the cover email thread, the document appears to be titled "Legal Services (Acacia).docx," but nothing in the cover email thread indicates what about the document might make it deliberative-process or attorney-client privileged other than that it is attached to an email from agency counsel. Ex. E (Bates Nos. 56-59). The *Vaughn* index simply says, "Attachment to June 3, 2025, email from Emily Mimnaugh regarding a contractor" and recites boilerplate attorney-client and deliberative-process privilege language. Dkt. 19-1 at 5. Defendant's *Vaughn* index does not provide an author, person or entity seeking advice, time period when authored, or purpose behind what Defendant alleges is a wholly privileged document. This description does not meet the standard to prevail on a claim of summary judgment. *King v. Dep't of Just.*, 830 F.2d 210, 219 (D.C. Cir. 1987) ("Specificity is the defining requirement of the *Vaughn* index and affidavit.").

**B. Email Communications**

HHS has also partially redacted various email threads, citing § 552(b)(5) privileges. Bates Nos. 17-22, 28-30, 42-43, 71, 81-82, 95-97, 135-136, 150, 169-170, 382-383. *See* Sandley Decl., Ex's B1-B10.

HHS claims one such thread, at Bates Nos. 135-136, is attorney-client and attorney work product privileged. Yet the thread includes HHS staff from a wholly different part of HHS, the Advanced Research Projects Agency for Health ("ARPA-H"), a component of HHS that "supports the development of high-impact solutions to society's most challenging health problems."[20] (copying emails addresses with domain names "@arpa-h.gov"). *See* Sandley Decl., Ex. B7. It is not plausible that these individuals engaged in cutting-edge medical research were co-represented by agency counsel in a wholly different component of HHS –the

[20] About, ARPA-H, *available at* https://arpa-h.gov/about.

Children, Families and Aging Division –along with staff in ORR. Copying individuals outside of the attorney-client relationship breaks the privilege. *United States v. Mejia*, 655 F.3d 126, 134 (2d Cir. 2011) ("[I]t is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence.") (quoting *In re Horowitz*, 482 F.2d 72, 81–82 (2d Cir. 1973)). Specifically, copying someone from an entirely different and apparently unrelated component of a large federal agency who is not "authorized to act or speak for the [agency] *in relation to the subject matter of the communication*" breaks the privilege. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977)) (emphasis added). In *Coastal States*, for example, the Department of Energy attempted to argue that circulation of a privileged document within the "confines of the agency" would not violate the privilege, but the court ruled that "would be far too broad a grant of privilege." *Id.* at 863. Therefore, Bates Nos. 135-136 should be produced without redactions.

As to the other email threads, Bates Nos. 17-22, 28-30, 42-43, 71, 81-82, 95-97, 150, 169-170, 382-383, HHS has not met its burden to justify these withholdings and show that there is no segregable information in the lengthy redactions. *See supra* Argument § I; Lancey Decl. ¶¶ 31-32; Dkt. 19-1. For instance:

- Bates 17-22, 150, 169-170, 382-383 (Ex's. B1, B8, B9, B10): According to Defendant's *Vaughn*, these emails mention or contain discussion of "the legal requirements" for the Vera contract, which expired in 2023.[21] Such requirements are likely statutory requirements that are factual in nature by themselves and likely segregable. Moreover, the fact that the Vera contract expired three years begs the question whether discussion

[21] *Thousands of underage children could soon be left to represent themselves in immigration court*, Latino Times (Aug. 10, 2026), https://www.latinotimes.org/2026/08/thousands-of-underage-children-could-soon-be-left-to-represent-themselves-in-immigration-court/

of the contract is, in fact, attorney-client privileged or work product privileged, and Defendant's *Vaughn* certainly gives no insight into this. At minimum, Plaintiffs ask the Court for in-camera review to confirm this communication is indeed entirely privileged and contains no segregable information.

- Bates Nos. 81-82 (Ex. B5): The subject line of the email, as well as the email, is redacted in full. Defendant's *Vaughn* provides no specifics as to why, and only boilerplate language as justification. *See Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F.Supp.3d 336, 350 (D.D.C. 2018) ("Under the general rule, the attorney-client privilege does not protect from disclosure ... the general purpose of the work performed." (internal quotation marks omitted); *Dzwonczyk v. State Univ. of New York at Buffalo*, No. 07-CV-00598(M), 2008 WL 11363386, at *1 (W.D.N.Y. July 7, 2008) ("I find that the subject line of these various e-mails, which do not reveal the substance of any attorney-client privileged communication are not privileged, and should therefore be produced."). At minimum, Plaintiffs ask the Court for in-camera review to confirm this communication is indeed entirely privileged and contains no segregable information.

## III. Entirely Withheld Spreadsheets Should Be Produced

Finally, HHS has fully withheld a spreadsheet (Bates Nos. 10-12, 143-145, 160-162, 177-179) "identifying Vera Institute contractual requirements with columns discussing whether they are statutorily required or otherwise legally required with citations," citing all three 552(b)(5) privileges. Dkt. 19-1 at 1; Sandley Decl., Ex's. C1-C4. The spreadsheet, which is an attachment to an email, is not attorney-client or attorney-work product privileged because at least one individual outside of the attorney-client relationship was copied on that email: Dan

Barry from ARPA-H, a wholly unrelated HHS entity. Sandley Decl., Ex. F (Bates No. 7); *supra* Argument, § II. This breaks the privilege.

And to the extent the spreadsheet contains data or facts, that information alone is not necessarily deliberative-process privileged. *Playboy Enters., Inc. v Dep't of Just.*, 677 F.2d 931, 935 (D.C. Cir. 1982) ("[A] report does not become a part of the deliberative process because it contains only those facts which the person making the report thinks material."); *Jud. Watch v. Dep't of State*, 241 F. Supp. 3d 174, 185 (D.D.C. 2017) ("[T]he mere selection of facts to be incorporated in a summary is [not] enough in and of itself to satisfy the requirement that it be deliberative."). Since Defendant has not shown in its declaration or *Vaughn* index how factual material is "inextricably intertwined" with privileged material, the agency has not met its "burden of establishing the necessity of keeping its records' factual observations undisclosed." *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 85 (2d Cir. 1991). HHS has not met its burden to show that there is no segregable information in the wholly withheld spreadsheet. *See supra* Argument § I; Lancey Decl. ¶¶ 31-32; Dkt. 19-1 at 1.

**IV. At a Minimum, the Court Should Review the Exempted Material *In Camera***

Should the Court be concerned about the propriety of ordering immediate disclosure, Plaintiffs respectfully request *in camera* review of the materials withheld by Defendant to ensure that Defendant's claimed exemptions apply. Courts have broad discretion to "examine the contents of . . . agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B). Courts have found such review necessary where, as here, there is a "conflict" between "record evidence" and an agency's assertions. *See*, *e.g.*, *Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*, 376

F. Supp. 3d 345, 360 (S.D.N.Y. 2019). For the reasons discussed above, should the Court deem it necessary, *in camera* review is warranted here.

## CONCLUSION

Defendant has failed to meet its summary judgment burden and continues to hide key policies and associated records. First, Defendant's claimed exemptions under 5 U.S.C. § 552(b)(5) are overbroad. Second, to the extent Defendant's searches failed to yield final versions of memoranda withheld under § 552(b)(5), Defendant's searches were inadequate. This Court should deny Defendant's Motion for Summary Judgment, grant Plaintiffs' Cross-Motion; compel disclosure of certain redacted and withheld portions of the records requested, or, in the alternative, conduct an *in camera* review of these records and order relief as the Court deems appropriate; and find that Defendant's searches were inadequate to the extent they failed to yield final versions of agency memoranda. These documents have enormous real-world implications: ORR and HHS have been reluctant to release public information about the new legal services contract and the policy memos. As legal services providers like the Florence Project and Amica work to provide thousands of unaccompanied children with critical legal services in a time of enormous uncertainty, the documents provide necessary insight into the agency's plans.

Dated: September 18, 2026

Respectfully submitted,

*/s/ C.J. Sandley*

C. J. Sandley*
Center for Constitutional Rights
P.O. Box. 486
Birmingham, AL 35201
(212) 614-6443
csandley@ccrjustice.org

Maria LaHood
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012

(212) 614-6430
mlahood@ccrjustice.org

Laura Belous*
Florence Immigrant and Refugee
Rights Project
PO Box 86299
Tucson, AZ 85754
(520) 934-7257
lbelous@firrp.org

Peter Cameron Alfredson*
Amica Center for Immigrant Rights
1025 Connecticut Ave NW, Ste. 701
Washington, DC 20036
(202) 899-1415
peter@amicacenter.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*